```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
   KAREN RANGE,                                             :
                                                            :   MEMORANDUM DECISION AND
                                  Plaintiff,                :   ORDER
                                                            :
           - against -                                      :   20-cv-5852 (BMC)
                                                            :
   COMMISSIONER OF SOCIAL SECURITY,                         :
                                                            :
                                  Defendant.                :
                                                            :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Plaintiff seeks review of a decision made by the Commissioner of Social Security, following a hearing before an Administrative Law Judge ("ALJ"), that she is not "disabled" as defined in the Social Security Act for the purposes of receiving disability insurance benefits. Prior to the onset of her severe impairments, plaintiff worked as a probation officer, a job that is relevant for reasons discussed below.[1]

The ALJ found that plaintiff has severe impairments of post-laminectomy syndrome and lumbar spondylosis. He also found, however, that plaintiff has sufficient residual functional capacity to perform sedentary work, as long as the job allows her to sit for 40 minutes per hour or walk for 40 minutes per hour; take a 2–5-minute break between sitting and walking; lift no more than 15-20 pounds occasionally; and not bend, squat, crawl or climb. Because a vocational expert testified that there are such jobs available in the national economy – specifically, a pre-parole counseling aide; a prisoner classification interviewer; and a case worker – and because the

---

[1] I will use the terms probation officer and parole officer interchangeably below as any distinctions between them are immaterial for these purposes. See New York Division of Criminal Justice Services, Frequently Asked Questions #1, available at https://www.criminaljustice.ny.gov/opca/general_faq.htm .

vocational expert also believed that plaintiff could have acquired skills in her past work as a probation officer that are transferable to these other jobs, the ALJ found that plaintiff was not disabled.

Plaintiff raises four points of error against the ALJ's decision. First, in finding that plaintiff did not meet the requirements of Listing of Impairments § 1.04, the ALJ offered no analysis. Second, she contends that the ALJ's assessment of her Residual Functional Capacity ("RFC") was improper because he did not consider her obesity or her use of a cane. Third, plaintiff asserts that in deciding on plaintiff's RFC, the ALJ relied exclusively on a treating physician's opinion that was dated five months before her alleged onset date, and should have instead developed the record to obtain more evidence. Finally, plaintiff argues that the ALJ should not have relied on the vocational expert's determination that plaintiff had transferable skills for the available jobs, as in fact there were no transferable skills.

I will discuss these points seriatim. None of them persuade me that the ALJ's analysis was erroneous or that there was not substantial evidence to support his decision.

**I.      Listing of Impairments § 1.04**

Plaintiff correctly points out that the ALJ offered no analysis of why plaintiff failed to meet Listing § 1.04. In finding that plaintiff did not have a Listed impairment, the ALJ simply stated: "In particular, the clinical requirements of Listing Section 1.04, governing spinal disorders, were carefully considered in this regard." The issue is whether the law required him to say more.

Plaintiff makes no argument that her impairments satisfied the criteria for Listing § 1.04. Rather, her objection is purely procedural. This is because the ALJ's determination of plaintiff's

2

RFC categorically precludes satisfaction of § 1.04's requirements.  There are at least three criteria in the Listing that plaintiff fails to meet.

First, the ALJ accepted the opinion of the consultative physician, Dr. Robert Greene, finding it "persuasive."  That medical opinion found an absence of atrophy or sensory deficit – findings that the ALJ expressly noted.  Right there, plaintiff fails to meet Listing § 1.04(A) because it requires, *inter alia*, "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory and reflex loss . . . ."

Similarly, the record and the ALJ's findings indicate that plaintiff had both a positive straight leg raising test and a negative straight leg test.  Intermittent satisfaction of a Listing is insufficient.  See SSAR 15-1(4), 80 Fed. Reg. 57418-02, 2015 WL 5564523, at *57420 (Sept. 23, 2015) (citing 20 C.F.R. Pt. 404.1525(c)(4)).  But even putting aside intermittency, her positive test did not meet the Listing.  Listing § 1.04(A) also requires that "if there is involvement of the lower back," as there is here, then the claimant must have "positive straight leg raising test (sitting and supine)."  Because the record gives no indication that plaintiff failed the test in both a sitting position and while lying on her back, she does not satisfy that criteria either.

In addition, Listing § 1.04(C) requires an "inability to ambulate effectively."  The test for "effectively" is severe.  It requires both of the claimant's hands to be holding assistive devices without which she cannot walk: "Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation *without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities*."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b) (emphasis added).  The examples provided in this Listing are

3

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single handrail.

Here, the parties dispute the ALJ's finding, discussed below, as to plaintiff's lack of need for a cane. But plaintiff does not contend that she needs two canes or two crutches. Nor does plaintiff contend that any walking difficulty prevents her from shopping and using public transportation, as the ALJ found she does, and as the record plainly demonstrates. To the contrary, she testified that she gets around her community by walking, and although it might cause her discomfort, she walks "to the store" about three blocks from her house. This is not the kind of ambulatory impairment that comes close to meeting Listing § 1.04's requirements.

In reaching this conclusion, I recognize that the ALJ's "analysis" of Listing § 1.04 is not a model to be emulated. At the very least, some ALJ decisions expressly incorporate the subsequent findings on a plaintiff's RFC into their findings on the Listings. See Piao v. Comm'r of Soc. Sec., No. 20-cv-5480, 2021 WL 5495955 (E.D.N.Y. Nov. 23, 2021). But whether expressly incorporated or not, the case law is clear that if the ALJ's findings on RFC are sound and also show that the claimant does not meet the Listings, it does not matter that those findings appear in the ALJ's decision before step 4 (determination of RFC). See Lewis v. Berryhill, 858 F.3d 858, 861–62 (4th Cir. 2017).

That principle is particularly applicable here because it is so clear that plaintiff does not meet Listing § 1.04. A remand to generate a more complete analysis would be pointless.

4

## II.     RFC challenges

### A.  Use of a cane

In his decision, the ALJ noted that plaintiff occasionally "uses a cane due to the antalgic gait." He held, however, that

> the evidence does suggest that she retained the capacity for a range of sedentary work, as compatible with the Dr. Reyfman opinion cited above, and with her actual and acknowledged daily activities. The need for a cane, for example, is not medically supported, and she did not have one at the hearing.

Plaintiff contends that this analysis was insufficient because the ALJ should have determined whether a cane was medically necessary, and, if so, should have included it among the limitations he posited in his hypothetical to the vocational expert.

This argument ignores plaintiff's own testimony conclusively demonstrating that she does not use a cane – she said so herself. The medical records show that she had a fall in 2017, and one of her treating physicians, Dr. Michael Gerling, saw her shortly after the fall. He observed that she was using a cane, although he never opined that the cane was medically necessary. When the ALJ asked plaintiff about it, she testified:

> Q: All right. There was a time when you were using a cane.
>
> A: For a short period.
>
> Q: That's after the fall, right?
>
> A: After, yes.
>
> Q: Okay.  And then you abandoned the cane, you felt like you didn't need [it] anymore, is that right?
>
> A: Yeah, not, not need, but I don't want it.

In fact, plaintiff didn't want it so badly that, as the ALJ observed, she didn't even bring one to the hearing – an event for which one might think that if there was any need for a cane at all, a disability claimant would bring it. And despite her skeletal problems, there is not a single physician in this record who recommended that she use a cane. By the time of the hearing before the ALJ, plaintiff had not used a cane for at least a year.

Sometimes there are obvious omissions in an ALJ's decision. But an ALJ cannot be expected to discuss every record notation that an able appellate lawyer might discern with the benefit of hindsight in reviewing an administrative record. Here, there was an insufficient basis for the ALJ to explore further whether the use of a cane had to be part of plaintiff's RFC.

**B. Obesity**

Plaintiff's point about obesity is similarly inflated. There is no question on this record that she is obese – the ALJ noted the finding from Dr. Greene that she is 5'4" tall and weighs 193 pounds. However, plaintiff concedes that there is no medical evidence in the record suggesting that her obesity materially contributes to her impairments or showing she was diagnosed as obese. Because there is a vacuum of evidence as to obesity being part of her problem, plaintiff contends that the ALJ "should have considered whether it is necessary to obtain a treating physician's opinion regarding the impact of Ms. Range's obesity on her ability to engage in basic work activities."

This is a "failure to develop the record" argument, but plaintiff has it backwards. It was plaintiff's burden of proof to show that her obesity contributed to the severity of her impairments. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). She was represented by an experienced disability lawyer at the administrative hearing. Yet aside from noting her height and weight, her treatment notes and physicians' reports do not suggest that her obesity impacted

6

the degree of her impairment. None of the physicians diagnosed obesity as one of her impairments and none even recommended that she lose weight.

Even though the administrative process is inquisitorial rather than adversarial, the ALJ did not have to reach as far as plaintiff contends. In effect, plaintiff is arguing that the possible consequences of obesity on skeletal impairments is so obvious that in every case where an obese disability claimant has such impairments, the ALJ is obligated to reach out to the treating physician and get an opinion as to the degree of impact, if any, that her obesity has on her impairments. Plaintiff cites no cases for this *per se* requirement and it is inconsistent with a claimant's burden of proof.

If even one physician had conclusively diagnosed plaintiff's obesity as a material factor in determining the severity of her impairments, plaintiff's point might be well-taken. But the absence of such an opinion in this record does not mean there is a "gap" that the ALJ had to fill. Rather, the ALJ could reasonably determine that the absence of substantial evidence meant that the contribution, if any, wasn't much, and that he did not have to proceed further on that issue.

### C. Dr. Reyfman's assessment

The ALJ's findings on plaintiff's limitations came almost verbatim from the opinion of her treating pain management doctor, Dr. Leon Reyfman. He treated her for back and neck pain from at least February 2015 through November 2017. In his report of February 6, 2015, he authorized her to return to sedentary work because he thought she could sit for 40 minutes or walk for 40 minutes with a 2–5-minute break after that period of activity; that she could lift 15-20 pounds occasionally; she could not bend, squat, crawl or climb; she had to avoid repetitive forceful, strenuous twisting, and jerking activities; and she could never engage in pulling, pushing, bending, lifting or carrying anything heavy.

Plaintiff does not dispute that this assessment of functional capacity from her treating physician is fully consistent with the ALJ's finding on her RFC. Nor could she, as Dr. Reyfman specifically opined that plaintiff's condition was good enough to return to work. Instead, plaintiff points out that Dr. Reyfman made his assessment five months before plaintiff's alleged onset date on July 5, 2015. Her point is that after that date, her condition continued to deteriorate, and so Dr. Reyfman's report cannot constitute substantial evidence as to her limitations during the insured period. Plaintiff asserts that because Dr. Reyfman's opinion pre-dated her onset date, "the ALJ was required to seek a medical opinion that at least proceeded [*sic*: probably should be "postdated"] Ms. Range's onset date and one that was recent enough to reflect her deteriorating condition and its effect on her limitations and impairments."

There is some support in the record for plaintiff's contention that her impairments continued to worsen over time, or at least did not improve, although there is other evidence contradicting that. But the problem with plaintiff's argument is that even if there was a deterioration, Dr. Reyfman's view of her functional capacity did not change at least through the end of 2017. Every one of his several treatment notes through May 2016 stated that plaintiff could return to work subject to the restrictions that he recommended (and that the ALJ later substantially adopted). After that, he no longer noted whether she could return to work – perhaps because by that time, she was no longer an employee – but his notes on her restrictions at the end of 2017 are fully consistent with the ability to do sedentary work: "Patient advised to avoid repetitive forceful, strenuous, twisting, jerky activities which may aggravate the underlying condition. In addition, patient was also advised to avoid activities like pulling, pushing, bending, lifting or carrying anything heavy." Thus, when plaintiff asserts that Dr. Reyfman found her able to work before her alleged onset date, that is an incomplete picture of her treatment with him.

8

Nor is there any gap in this record that the ALJ had to fill. Dr. Reyfman's reports, as noted above, continued through late 2017. Dr. Greene's consultative report, on which the ALJ also relied, was in February 2018. Since the period of disability here was July 2015 through November 2019, the ALJ had a complete record on which to decide this case.

**III.     Vocational expert testimony**

Because plaintiff is over 55 years old, to satisfy the burden of proof at step 5 of the sequential analysis – whether there were jobs in the national economy that she could perform – the Commissioner had to include a determination that there were jobs to which she could transfer skills that she had acquired in her prior job. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(f) ("In order to find transferability of skills to skilled sedentary work for individuals who are of advanced age (55 and over), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry."). The vocational expert testified that she would have acquired such skills as a probation officer. Specifically, the expert opined that the skills plaintiff would have acquired as a probation officer were investigating, advising, counseling, information gathering, verbal recording skills, and protection of others. All of these skills, he further testified, were components of the jobs of a pre-parole counseling aide; a prisoner classification interviewer; and a case worker. The ALJ relied on this testimony in finding that there were jobs in the national economy that plaintiff could perform.

Plaintiff argues that the skills identified by the vocational expert are not, in fact, skills, but are "traits (aptitudes or abilities)." She asserts that she could already do those things before she became a probation officer. That does not give enough credit to probation officers, whose job is part law enforcement and part social work. It seems to me that only a few people are born

9

with investigative skills; most have to be trained and hone their skills with experience. The same is true of knowing how to deal with people experiencing difficult criminal problems.

To support her argument, plaintiff points to isolated tasks performed by pre-parole counseling aides, prisoner classification interviewers, and case workers that are not required in the work of a probation officer. She shows that according to the Dictionary of Occupational Titles ("DOT"), a pre-parole counselor helps prepare applications for public benefits; a prisoner classification interviewer analyzes a prisoner's mental and physical capabilities; and a caseworker reviews service plans to determine the quantity of services to be provided to a client. First, I am not at all sure that these examples support the distinction plaintiff is trying to draw rather than undermine it. A probation officer must have some familiarity with a client's public benefit array. Moreover, she will need to make judgments concerning her subjects' mental and physical capabilities so she can help the probationers locate appropriate employment and stick to a release plan.

> The definition of pre-parole counseling aide is summarized in the DOT as follows:
>
> Provides individual and group guidance to inmates of correctional facility, who are eligible for parole, and assists in developing vocational and educational plans in preparing inmates for reentry into community life: Conducts inmate orientation sessions to explain programs and resources available to inmates and to induce inmates to join programs. Interviews inmates to record data on individual problems, needs, interests, and attitude. Holds individual and group counseling sessions to discuss programs available that affect inmate's reentry into community life, such as housing and financial aid, veteran's benefits, work release programs, vocational rehabilitation, and job search assistance. Prepares and maintains case folder for each inmate and discusses findings with supervisor to obtain assistance in establishing goals and plan of action for inmates. Conducts followup interview to ascertain inmate progress. Prepares correspondence and applications for medicare, medicaid, veteran benefits, food stamps, and housing. Telephones and corresponds with persons and agencies outside facility to ensure that family and business matters are attended to. Meets with family members at facility to discuss and resolve problems prior to release of inmate. Develops and prepares informational packets for inmate, listing outside agencies and programs that could assist ex-offender upon release.

Preparole-counseling Aide, Dictionary of Occupational Titles 195.367-026, 1991 WL 671599.

Although these tasks are not all within a probation officer's bailiwick, most of them are. The pre-parole counseling aide, as the title suggests, just sees the parolee at an earlier stage of societal re-entry than a parole officer. The DOT summarizes the job of probation-and-parole officer as follows:

> Counsels juvenile or adult offenders in activities related to legal conditions of probation or parole: Confers with offender, legal representatives, family, and other concerned persons, and reviews documents pertaining to legal and social history of offender to conduct prehearing or presentencing investigations and to formulate rehabilitation plan. Compiles reports, testifies in court, and makes recommendations concerning conditional release or institutionalization of offender. Informs offender or guardian of legal requirements of conditional release, such as visits to office, restitution payments, or educational and employment stipulations. Counsels offender and family or guardian, helps offender to secure education and employment, arranges custodial care, and refers offender to social resources of community to aid in rehabilitation. Evaluates offender's progress on follow-up basis including visits to home, school, and place of employment. Secures remedial action by court if necessary. Evaluates offender's progress on follow-up basis including visits to home, school, and place of employment. Secures remedial action by court if necessary. May be employed by correctional institution, parole board, courts system, or separate agency serving court. May specialize in working with either juvenile or adult offenders. May specialize in working with offenders on probation and be designated Probation Officer. May specialize in working with offenders on parole and be designated Parole Officer.

Probation-and-parole Officer, Dictionary of Occupational Titles 195.107-046, 1991 WL 671578.

The job of pre-parole counseling aide is very close to the next step, *i.e.*, a parole officer. Of course, the two jobs are not identical, but the skills required of a pre-parole counseling aide are "so closely related to" those of a probation or parole officer that plaintiff "could be expected to perform [the new] job[ ] at a high degree of proficiency with a minimal amount of job orientation." Brown v. Colvin, 146 F. Supp. 3d 489, 496 (W.D.N.Y. 2015).

11

The responsibilities of the other two jobs identified by the vocational expert are less similar.  But there is still a substantial overlap in the skills required to perform them proficiently and the skills required to be a probation officer.  See Prisoner-classification Interviewer, Dictionary of Occupational Titles 166.267-022, 1991 WL 647350 ("Interviews new prison inmates to obtain social and criminal histories to aid in classification and assignment of prisoners to appropriate work and other activities: Gathers data, such as work history, school, criminal, and military records, family background, habits, religious beliefs, and prisoner's version of crime committed.  Analyzes prisoner's social attitudes, mental capacity, character, and physical capabilities and prepares admission summary based on data obtained.  Explains prison rules and regulations."); Caseworker, Dictionary of Occupational Titles 195.107-010, 1991 WL 671569 ("Counsels and aids individuals and families requiring assistance of social service agency.").  And, of course, the Commissioner need only establish one available job to satisfy the burden at step 5.  Bavaro v. Astrue, 413 F. App'x 382, 384 (2d Cir. 2011).

Thus, the ALJ did not err in accepting the testimony of the vocational expert as to the availability of jobs for someone with plaintiff's transferrable skills.

## CONCLUSION

Plaintiff's motion for judgment on the pleadings is denied and the Commissioner's motion for judgment on the pleadings is granted.  The Clerk is directed to enter judgment, dismissing this case.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
U.S.D.J.

Dated: Brooklyn, New York
       December 8, 2021